UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JOSEPHINE ANDRADE et. al., | CASE NO. SA CV 03-1157 CJC (ANx) |
| Plaintiffs, | ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING INJUNCTIVE RELIEF |
| v. | |
| MIGUEL A. PULIDO, Mayor of City of Santa Ana, in his official capacity, et. al., | |
| Defendants. | |

## I. INTRODUCTION

Defendants, certain officials of the City of Santa Ana ("City"), installed traffic barriers in the French Court and French Park neighborhoods of the City as a result of a vote held in October of 2000. Plaintiffs, various residents of the French Court neighborhood, challenge the vote on the ground that it violated the Equal Protection Clause of the United States Constitution. Plaintiffs filed a motion seeking summary judgment on their constitutional claim and an injunction requiring the City to remove the traffic barriers installed as a result of the vote. After considering the evidence presented

by the parties, and the arguments of their counsel, the Court grants Plaintiffs' motion. The Court finds the October 2000 vote was constitutionally flawed. Many residents who live in apartments and condominiums in the French Court and French Park neighborhoods were not allowed to vote, yet all residents living in single family homes in the two neighborhoods were allowed to vote.[1] The vote improperly permitted hierarchies of residents in violation of the Equal Protection Clause of the United States Constitution. Under our Constitution, the vote of a resident in a spartan apartment counts just as much as the vote of a resident in a majestic single family home. Since the October 2000 election cannot stand, neither can the traffic barriers that were installed as a result of it. The City must take those traffic barriers away.

## II. THE UNDISPUTED FACTS

### A. THE CITY'S PROCEDURES FOR IMPLEMENTING TRAFFIC PLANS

Defendants are various city officials and agencies in charge of traffic plans and voting procedures for the City: Miguel A. Pulido is the City's mayor, James G. Ross is the director of the City's Public Works Agency, which is in charge of implementing neighborhood traffic plans, and Rick F. Older is the chairperson of the Environmental Transportation Advisory Committee ("ETAC"), an advisory board to the City Council in

//
//
//
//
//

---

[1] The unequal treatment of residents was especially divisive here because a substantial majority of residents in the French Court neighborhood live in apartments or condominiums.

charge of reviewing environmental issues, including neighborhood traffic plans. (UF[2] 22-35.) All individuals are sued in their official capacities. (Id.)

In October of 2000, the City maintained a 13-step procedure for the implementation of traffic plans. (UF 26.) These procedures were set forth in a bulletin entitled "Procedures for Neighborhood Traffic Plans" ("Procedures"), revised by the ETAC. (UF 26.) Step 6 of the Procedures required all proposed traffic plans to be voted on by "eligible voters" in the "area of impact" to determine whether or not residents support proposed traffic plans. (UF 41.) The Procedures defined "area of impact" as:

> A section of the City, approved by the ETAC, based on the following guidelines:
>
> 1. a. The area within the boundaries of the established neighborhood proposing the plan, and/or
>    b. The area within the natural neighborhoods boundaries, i.e. arterial streets, freeway, river/creek, and
>
> 2. The street(s)/block(s) anticipated to be affected by the traffic Plan due to:
>    a. Significant increases in neighborhood traffic on the street segment, and/or
>    b. Noticeable increases in "cut-through" traffic on the street segment,

---

[2] "UF" refers to Plaintiffs' Statement of Uncontroverted Facts, submitted on September 2, 2004. Based on Plaintiffs' and Defendants' Statement of Genuine Issues, these facts, which are relevant to the Motion for Summary Judgment, are not disputed by the parties. Defendants indicated their lack of dispute to these facts in their Statement of Genuine Issues in Opposition. Any facts that are disputed have not been used by the Court in its decision to grant summary judgment.

    and/or

  c. Restricted vehicle access to and/or from the block.

(UF 30.)

The Procedures defined "eligible voters" as:

  Those to whom ballots are distributed, within a given area of impact,
  as a result of their being in one of the following groups:

  1. Residents of single family homes, duplexes, three-plexes, and four-plexes (one vote per household).

  2. Owners of apartment buildings/complexes (one vote per building or complex).

  3. Condominium complex (one vote per association).

  4. Owners of non-residential properties, including those with business, commercial and vacant land uses (one vote per parcel).

  5. Designated representatives of properties with institutional land uses such as schools, government offices, and non-profit organizations (one vote per parcel).

(UF 37.)

Upon receiving the ballots from eligible voters in the area of impact, per Procedures Step 7, the City would tabulate the votes. To be considered by the City for implementation, a traffic plan would have to be approved by at least 50 percent plus one vote of the valid ballots. (UF 44.) After temporary implementation of any approved plan on a six month trial basis, the Public Works Agency would conduct a follow-up traffic study to determine the effectiveness of the plan. Pursuant to Step 11, residents of the area of impact again would be polled to determine whether the temporary installation should be removed or made permanent. (UF 65.) Ballots would be mailed to residents in the area of impact, and a traffic plan would be approved on a permanent basis if it obtained approval of at least 66 percent of the valid ballots. (UF 52.)

### B. THE FRENCH PARK NEIGHBORHOOD TRAFFIC PLAN

The parties' debate in this matter centers on the City's implementation of temporary traffic barriers, pursuant to the Neighborhood Traffic Plan, which divert traffic in the French Park and French Court neighborhoods. The Neighborhood Traffic Plan was implemented using the various steps in the Procedures described above. (UF 27.) The Neighborhood Traffic Plan consists of three temporary barriers: (1) a barrier on Washington Avenue, which runs east/west, near Poinsetta; (2) a barrier on French Street, which runs north/south, just north of Washington Avenue; and (3) a barrier on Spurgeon Street, which runs north/south, just north of Washington Avenue. (UF 29.) The Neighborhood Traffic Plan also includes a temporary semi-diverter on Wellington Avenue at Poinsettia Street. (Id.) The barrier on Washington Avenue prevents or diverts traffic from the Logan neighborhood from running west into the French Park neighborhood on Washington Avenue. (Id.) The barriers on French and Spurgeon Streets divert or prevent traffic from the French Court neighborhood from crossing Washington Avenue heading south into the French Park neighborhood and towards the

1  City's downtown. (Id.) Therefore, the principal impact of the Neighborhood Traffic
2  Plan is to block traffic between the French Court and French Park neighborhoods. The
3  French Park area primarily is a neighborhood with large, single family homes. (UF 40;
4  48). The French Court neighborhood consists largely of apartment buildings and
5  condominiums. (Id.)

7  In the Summer of 2000, as part of the 13-step Procedures, ETAC sponsored a
8  meeting of French Park and French Court residents to explain the upcoming
9  neighborhood ballot to approve the Neighborhood Traffic Plan on a trial basis. (UF 28.)
10 Only residents from the French Park and French Court communities were invited to
11 attend. (Id.) In October of 2000, following Step 6 of the Procedures, ballots were
12 mailed to "eligible voters" in the "area of impact." (UF 37-38; 41). Using engineering
13 judgment, Defendants determined the area of impact to be only the French Court and
14 French Park neighborhoods. (UF 31; 35). Moreover, as described above, the City
15 divided voter eligibility in the "areas of impact" into five categories: (1) residents of
16 single family homes, duplexes, three-plexes, and four-plexes (one vote per household);
17 (2) owners of apartment buildings (one vote per building); (3) the association of a
18 condominium complex (one vote per association); (4) owners of non-residential
19 properties (one vote per parcel); and (5) designated representatives of properties with
20 institutional land use (one vote per parcel). (UF 37.) Because of the large number of
21 apartment buildings and condominiums in the French Court neighborhood, a
22 disproportionate number of individuals were defined as "eligible voters" in the French
23 Park neighborhood than in the French Court neighborhood. Specifically, based on
24 counts obtained in July of 2000, there were a total of 387 eligible voters in French Park
25 and 115 eligible voters in French Court. (UF 40.)
26 //
27 //

The ballot listed two choices for voters: "YES, I am in favor of installing the traffic plan on a 6-month basis" and "NO, I am not in favor of installing the traffic plan on a 6-month basis." (UF 42.) Voters in the French Court and French Park neighborhoods approved temporary implementation of the Neighborhood Traffic Plan by a vote of 66 to 60. (UF 45.) Accordingly, in November of 2001, the City installed temporary traffic barriers in accordance with the Neighborhood Traffic Plan. (UF 46.)

Pursuant to Step 11, a second ballot to determine the permanent implementation of the Neighborhood Traffic Plan was mailed to residents in the French Court and French Park neighborhoods in July of 2003. (UF 50; 52.) Again, due to the Procedures' definition of "eligible voters," a larger number of households in the French Park neighborhood were permitted to vote in the election than households in the French Court neighborhood. (UF 49.) At the time of this election, 263 ballots were mailed to persons in French Park and 132 ballots were mailed to persons in French Court. (Id.) In French Park, however, there were approximately 289 households (141 single family homes, 53 households in 2-plex, 3-plex or 4-plex units, 43 apartments in buildings with more than 4 units, and 52 condominium units), while there were approximately 850 households in French Court (63 single family homes, 16 households in 2-plex, 3-plex or 4-plex units, 723 apartments in buildings with more than 4 units, and 46 condominium units). (UF 47-48). In other words, approximately 91% of households in French Park received a ballot for the July 2003 election while only 16% of the households in French Court received a ballot.

Plaintiffs, various City residents, filed a Complaint against the City in July of 2003, seeking a temporary restraining order prohibiting Defendants from opening or

counting any of the July ballots. (UF 53.) Plaintiffs' Complaint,[3] brought pursuant to 42 U.S.C. 1983, sought injunctive and declaratory relief for the violations of Plaintiffs' constitutional rights. Plaintiff, Josephine Andrade, lives in the Logan neighborhood, three blocks from the temporary traffic barrier implemented on Washington and Poinsetta. (UF 2-3.) Because the Logan area was not determined by the City to be part of the "area of impact," Ms. Andrade was not permitted to vote in the October 2000 election. (UF 5.) Mr. Wade Little and Mr. Kenneth Garwood, both also Plaintiffs in this action, own and live in condominiums with 22 units in the French Court neighborhood. (UF 8; 20.) Both Mr. Little and Mr. Garwood were denied the right to cast individual votes in the October 2000 election because of the City's definition of "eligible voters." (UF 9;21.) Plaintiffs Ms. Andrade, Mr. Little, and Mr. Garwood assert the denial of the right to vote violated their constitutional protections under the Equal Protection Clause of the Constitution. Finally, Plaintiff Mr. Leonardo Sarinana, an individual who rents a single family home in the French Court neighborhood who did vote in the October 2000 election (UF 12-13;15), alleges his constitutional rights were violated because Defendants did not properly inform him as to the impact of his vote. According to Mr. Sarinana, the ballot for the October 2000 election stated his vote was to be used for purposes of a temporary six-month implementation of the Neighborhood Traffic Plan, yet the Neighborhood Traffic Plan has remained in place for almost three years. Mr. Sarinana asserts this is a violation of his Due Process rights under the Constitution.

On July 24, 2003, the Court granted Plaintiffs' Ex Parte Application for a Temporary Restraining Order prohibiting counting ballots from the July 2003 election concerning permanent installation of traffic barriers under the Neighborhood Traffic

---

[3] On May 26, 2004, the Court, over Defendants' objections, granted Plaintiffs' Motion for Leave to File a First Amended Complaint. Plaintiffs First Amended Complaint added Plaintiffs Mr. Garwood and Mr. Sarinana and asserted an additional cause of action under the Due Process Clause of the Fourteenth Amendment. The First Amended Complaint is the operative complaint in this action.

8

Plan. After further briefing and oral argument, the Court granted Plaintiffs' Motion for Preliminary Injunction on August 4, 2003, finding that the balloting used by the City to be voting procedures subject to constitutional protection and that Plaintiffs had demonstrated a probability of success on the merits of their constitutional claim. This preliminary injunction prohibited Defendants from opening or counting any of the returned ballots in the July election regarding the Neighborhood Traffic Plan.

### III. SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS IS PROPER

Plaintiffs seek summary judgment on the basis that the City's voting procedures for temporary implementation of the Neighborhood Traffic Plan in the October 2000 election violated the Equal Protection and Due Process clauses of the Fourteenth Amendment. For the reasons stated below, Plaintiffs Mr. Garwood and Mr. Little have satisfied their burden of showing there is no genuine issue of material fact for trial as to their Equal Protection claim and that they are entitled to judgment as a matter of law.[4]

#### A. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rules of Civil Procedure Rule 56(c), summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, taken together with the affidavits, if any, show that there is no genuine issue as to

---

[4] Plaintiffs also move for summary judgment on the basis that Ms. Andrade was denied her fundamental right to vote because the City defined the "area of impact" subject to the vote in the October 2000 election too narrowly. Similarly, Plaintiffs contend the constitutional rights of Mr. Sarinana, who voted in the October 2000 election, were violated because his vote in favor of placing a six-month temporary barrier has been used to keep the barrier in place for more than three years. Because the Court determines the City violated the constitutional rights of other named Plaintiffs and orders equitable relief, it is unnecessary for the Court to make specific rulings as to these allegations. The Court does note, however, that in their Opposition to the Motion for Summary Judgment Defendants have not contested the conclusion that Ms. Andrade and Mr. Sarinana's rights were violated.

1  any material fact and that the moving party is entitled to judgment as a matter of law."
2  Fed. R. Civ. Pro. 56(c). A party who moves for summary judgment who bears the
3  burden of proof at trial must produce evidence that would entitle him to a directed
4  verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc.*
5  *v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000). Once the moving party carries this initial
6  burden, the non-moving party must go beyond the pleadings and by its own evidence
7  "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. Pro
8  56(e). The non-moving party must identify with particularity the evidence precluding
9  summary judgment, as it is not the task of the district court to scour the record in search
10 of a genuine disputed issue. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the
11 non-moving party fails to produce sufficient evidence to create such a genuine issue, the
12 moving party is entitled to summary judgment. *Celotex Corp v. Catrett*, 477 U.S. 317,
13 322 (1986).

15 For purposes of summary judgment, an issue is "genuine" only if there is a
16 sufficient evidentiary basis on which a reasonable fact finder could find for the non-
17 moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is
18 "material" only if it might impact the outcome of the suit under the governing law. *Id.*
19 In considering a motion for summary judgment, the court may not make credibility
20 determinations or weigh the evidence and must draw all inferences in favor of the non-
21 moving party. *Id.* at 255. "Where the record taken as a whole could not lead a rational
22 trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"
23 *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574 (1986).
24 //
25 //
26 //
27 //
28

B. **THE CITY'S VOTING PROCEDURES IN THE OCTOBER 2000 ELECTION VIOLATED THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION**

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, binding on the national government, the states, and their political subdivisions, controls the determination of this motion. The Equal Protection Clause "directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982), *reh'g denied*, 458 U.S. 1131 (1982) (*quoting F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Its inclusion in the Constitution was "intended as a restriction on state legislative action inconsistent with elemental constitutional premises." *Id.* In the voting context, the Equal Protection Clause confers on individuals the substantive right to participate on an equal basis with other qualified voters whenever a state adopts an electoral process for determining who will represent any segment of the population. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 59 fn. 2 (1973). Accordingly, "the right to vote in an election is protected by the United States Constitution against dilution or debasement." *Hadley v. Junior College District of Metropolitan Kansas City, MO*, 397 U.S. 50, 54 (1970).

It has been recognized that States have broad powers in determining the conditions under which the right to suffrage may be exercised. *Evans v. Cornman*, 389 U.S. 419, 421 (1970). Once the franchise is granted to the electorate, however, "lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966). In other words, "in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's." *Hadley*, 397 U.S. at 54. This principle holds true for congressional elections, state legislative elections, and local elections. *Id.* Supreme Court precedent has laid out the basic

standard to be applied in cases challenging, on constitutional grounds, franchise restrictions: "as long as the election in question is not one of special interest, any classification restricting franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest." *Hill v. Stone*, 421 U.S. 289, 297 (1975). Even in a limited purpose election, if the right to vote is granted to some otherwise qualified voters and denied to others, "'the Court must determine whether the exclusions are necessary to promote a compelling state interest.'" *Cipriano v. City of Houma*, 395 U.S. 701, 704 (1969) (*quoting Kramer v. Union Free School District No 15*, 395 U.S. 621, 627 (1969)). Furthermore, "no less showing that the exclusions are necessary to promote a compelling state interest is required merely because 'the questions scheduled for the election need not have been submitted to the voters.'" *Id.* (*quoting Kramer*, 395 U.S. at 629). "[O]nce citizens are granted the right to vote on a matter, the exercise of the vote becomes protected by the Constitution even though the state was not obliged to allow any vote at all." *Hussey v. City of Portland*, 64 F. 3d 1260, 1263 (9th Cir. 1995). This use of strict scrutiny to protect suffrage arises from "the significance of the franchise as the guardian of all other rights." *Plyler*, 457 U.S. at 281 fn 15.

The parties do not dispute that, according to the Procedures, as described above, voter eligibility for the Neighborhood Traffic Plan was divided into five categories of "eligible voters." Using these Procedures, households living in a single family residence were given one vote while households in a condominium were deprived the right to cast an individual vote. Instead, their condominium association was given one vote. Similarly, residents of apartments who did not own the apartment building were disenfranchised. As a result, in the October 2000 election, the 38 apartment buildings in the French Court neighborhood were given only one vote each (per owner) and the one

condominium association received one vote for the entire condominium complex.[5] These categories clearly restricted franchise based on the *type* of home individuals resided in. For example, the votes of Mr. Garwood and Mr. Little's households (who each lived in a condominium complex with 22 units and were given one vote per association), received 1/22 the weight of the vote of a household living in a single family home. In their Opposition to the Motion for Summary Judgment, Defendants do not argue or provide evidence of a compelling justification for this classification system. Defendants do not assert the classification system for voting in the Neighborhood Traffic Plan was designed to limit the franchise only to those primarily interested in the Neighborhood Traffic Plan. There is nothing in the record to suggest that households in single family homes would feel the impact of the Neighborhood Traffic Plan any differently than those in apartments or condominiums. For residents of any type of home in the area, traffic is diverted and they are required to take different routes to move between the French Park and French Court neighborhoods. Indeed, the benefits and the burdens of the Neighborhood Traffic Plan fall indiscriminately on single family home residents and condominium/apartment residents alike. Therefore, the City has failed to prove that under its classification all those excluded from casting individual votes were substantially less interested or less impacted by the results of the election than those permitted to vote. Stated differently, the dilution of voting power was improper because the group characteristic of those denied the right to vote – the type of residence – bore no valid relation to the interest of the group in the subject matter of the election.

---

[5] Discussion of the contrast between the number of ballots sent versus the number of households in a given area for the July 2003 election further evidences disenfranchisement based on the household's type of residence. The parties agree that in July of 2003, although 850 households lived in the French Court neighborhood, according to the City's definition, there were only 132 "eligible voters." Therefore, only 16 percent of the households in the French Court neighborhood received a ballot. In the French Park neighborhood, 263 of 289 households were deemed "eligible voters," so that 91 percent of households received a ballot.

Defendants' restriction of the franchise is not even reasonably related to a legitimate government interest, let alone one that is compelling. Any argument by Defendants that voting restrictions were logical in order to protect the vote from being skewed by residents who likely are transient in nature (an argument raised in opposition to Plaintiffs' Motion for Preliminary Injunction) is unpersuasive and does not pass constitutional muster. Transient residents may live in either single family homes or apartment buildings, and there is nothing in the record to suggest a greater number reside in apartments than single family homes. For example, Plaintiff Mr. Sarinana, who was permitted to vote in the October 2000 election because he lives in a single family home in French Court, *rents* the single family residence that entitled his household to a single vote. More importantly, the vote of a resident renting an apartment means just as much as the vote of a resident owning a single family home, regardless of whether the apartment resident moves next week, next month, next year, or never.[6] As the Supreme Court has so aptly stated:

> A citizen . . . is no more nor less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of 'government of the people, by the people . . . for the people.'

*Reynolds v. Sims*, 377 U.S. 553, 568 (1964).

---

[6] The City's previous reliance on the supposed transient nature of apartment residents is curious. First, it does not explain the restriction on the vote of condominium residents to one vote per association. Second, such a justification runs afoul of the Supreme Court's disdain for durational residence requirements for voting and mandate that such restrictions satisfy strict scrutiny. *See Dunn v. Blumstein*, 405 U.S. 330 (1972).

In sum, the City's definition of "eligible voter" erects a classification system that impermissibly disfranchised qualified voters solely because of the type of home they resided in. Defendants have not shown any justification for this classification system and they fall far short of meeting the "compelling state interest" requirement. Accordingly, Plaintiffs are entitled to summary judgment on their claim that Defendants violated Mr. Little and Mr. Garwood's fundamental right to an equal vote under the Constitution, in violation of the Equal Protection Clause.

### III. INJUNCTIVE RELIEF IS APPROPRIATE

#### A. AN ARTICLE III CASE OR CONTROVERSY FOR PURPOSES OF INJUNCTIVE RELIEF DOES EXIST

In their Motion for Summary Judgment, Plaintiffs request injunctive relief, either in the form of voiding the October 2000 election and ordering Defendants to remove the temporary traffic barriers or requiring a second election that comports with Due Process and Equal Protection.[7] Prior to determining the appropriate remedy, it is necessary to address Defendants' assertions that a live case or controversy no longer exists in this matter to permit the injunctive relief requested by Plaintiffs. More specifically, according to Defendants, there is no continuing threat of harm justifying injunctive relief for Plaintiffs because the City has undeniably repealed the Procedures and has adopted amended mechanisms for implementation of traffic plans that do not contain the

---

[7] In their First Amended Complaint, Plaintiffs seek (1) a declaration that Defendants' actions violated Plaintiffs' right to vote; (2) a permanent injunction prohibiting Defendants from counting the ballots from the July 2003 election for a permanent traffic barrier; and (3) a permanent injunction prohibiting Defendants from continuing to validate the election held in October 2000 and ordering removal of the traffic barriers. In their Opposition to the Motion for Summary Judgment, Defendants agree that the preliminary injunction issued by the Court "has effectively become permanent insofar as the *Procedure for Neighborhood Traffic Plans* that was the subject of this litigation no longer exists and the voting results of the prior election will not be tabulated as part of the decision-making process."

infirmities of the prior process.[8] Stated differently, the issue presented by Defendants is whether Plaintiffs meet the preconditions for asserting an injunctive claim in a federal forum. The Court concludes Plaintiffs satisfy such requirements.

It is well-settled that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement of Article III of the Constitution by alleging an actual case or controversy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). In order to make such a showing, Plaintiffs "must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *Id.* (*quoting Baker v. Carr*, 369 U.S. 186, 204 (1962)). An abstract injury is insufficient; instead, plaintiffs must demonstrate they have "'sustained or [are] immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 101-102 (internal citations omitted). In assessing the case or controversy requirement, it is critical to note that "'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Id.* at 102 (*quoting O'Shea v. Littleton*, 414, U.S. 488, 495-496 (1974)). There must be a real and immediate threat

---

[8] In their Opposition, Defendants assert a series of changes in the City's policies have occurred since the Court's issuance of a preliminary injunction. According to Defendants, on August 4, 2003, the City Council, in deference to the Court's ruling on the motion for preliminary injunction, repealed the Procedures. The City Council further adopted a policy statement giving final discretion to implement traffic plans to the City Council (as may be delegated to the ETAC), and directed staff to create amended procedures for implementation of traffic plans. On July 6, 2004, the City Council adopted such amended procedures pursuant to the City's power under California Vehicle Code §21101(f). These new procedures do not provide for elections in the City's determination of whether to install traffic design features, but rather give ultimate discretion to the City Council. In their Reply, Plaintiffs do not contest or dispute these factual assertions, but rather disagree as to their impact on this case. The Court does not render any decision as to the legality of these amended procedures as it is not before the Court. The Court will not engage in the issuance of advisory rulings.

of injury; a speculative claim that plaintiffs will again experience injury if the practice is continued is insufficient.

Applying the above principle to the facts presented in this case, Plaintiffs' standing to justify the injunctive relief requested depends on whether they continue to suffer or are likely to feel future injury as a result of the City's unconstitutional voting scheme. A real and immediate injury exists: the temporary traffic barriers stand by virtue of the unconstitutional October 2000 election. These traffic barriers cause injury by continuing to divert traffic between the French Park and French Court neighborhoods, without the required approval of all impacted voters. The presence of these traffic barriers functions as a "continuing, present adverse effect" of the unlawful disenfranchisement of Plaintiffs.[9]

### B.    REMOVAL OF THE TRAFFIC BARRIERS IS REQUIRED

As explained above, the challenged Procedures contain a classification that excludes otherwise qualified voters who are as substantially affected and directly interested in the matter voted upon as those who are permitted to vote. Such a statute clearly does not meet the exacting standards imposed on restrictions that selectively distribute the franchise. Plaintiffs continue to suffer injury as a result of these constitutional violations.

---

[9] The Court also notes this case is not mooted by the repeal of the Procedures. Part or all of a case may become moot if: "(1) subsequent events [have] made it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur, *and*, (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). The burden of demonstrating mootness is a heavy one. *Id.* As stated above, although the prior voting scheme has been repealed, the traffic barriers, put in use only as a result of the unconstitutional October 2000 election, remain in place. Thus, the repeal has not "completely and irrevocably eradicated the effects" of the constitutional violations.

The settled principle in federal equity cases is that "'the nature of the violation determines the scope of the remedy.'" *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (*quoting Swann v. Charlotte-Mecklenburg Bd. of Education*, 402 U.S. 1, 16 (1971)). Of course, any remedy must take into account the important considerations of federalism and the "'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* (*quoting Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)). Keeping these settled principles in mind, the Courts finds the issuance of injunctive relief warranted. The basic requirements for the issuance of equitable relief, the likelihood of substantial and irreparable injury and the inadequacy of remedies at law, are satisfied: the right to vote is one of the most integral aspects of our system of governance and monetary damages are unable to compensate Plaintiffs for their deprivation of such a fundamental right. The City installed, and to this day maintains, the temporary traffic barriers of the Neighborhood Traffic Plan only because of the October 2000 election. This election, however, was constitutionally flawed. The election improperly permitted hierarchies of residents in violation of the Equal Protection Clause of the United States Constitution. Since the October 2000 election cannot stand, neither can the temporary traffic barriers that are being maintained as a result of it. The temporary traffic barriers may not remain.

## IV.   CONCLUSION

Plaintiffs' Motion for Summary Judgment is GRANTED. The City's voting procedures violate the right to Equal Protection under the Constitution of the United

//
//
//

1  States. In order to safeguard and endorse the Constitution's fundamental guarantees, and
2  to remedy the City's violation of such rights, equitable relief is appropriate.

4  DATED: December 16, 2004

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE